**MICROSTRATEGY, INC., Plaintiff,**

v.

**BUSINESS OBJECTS, S.A.,
et al., Defendants.**

**No. CIV.A. 01–CV–826.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 6, 2004.

Thomas J. Cawley, Ingo Frank Burghardt, Hunton & Williams, McLean, VA, Gregory N. Stillman, Benita Webster Ellen, Hunton & Williams, Kenneth Reed Mayo, Best Law Offices PC, Norfolk, VA, Peter Edward Moll, Joseph Phillip Lavelle, Brian D. Wallach, Paul Yang, Howrey Simon Arnold & White LLP, Washington, DC, James Frederick Valentine, Howrey Simon Arnold & White LLP, Menlo Park, CA, for Plaintiff.

Dana Johannes Finberg, David James Sensenig, LeClair Ryan PC, Richmond, VA, Ray Webb King, LeClair Ryan PC, Norfolk, VA, Gary H. Ritchey, Daniel J. Furniss, Theodore G. Brown, III, Townsend Townsend & Crew LLP, Palo Alto, CA, Ian Lawrence Saffer, Townsend Townsend & Crew LLP, Denver, CO, for Defendants.

Michael Braden Hubbard, Seyfarth Shaw, Washington, DC, for Movant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRIEDMAN, District Judge.

This matter is before the court following a trial on the plaintiff's, MicroStrategy Incorporated, claims for tortious interference and misappropriation of trade secrets. The tortious interference claim was tried by a jury. Following conclusion of the plaintiff's case, for the reasons stated on the record, the court entered judgment as a matter of law in favor of the defendants, Business Objects, S.A. and Business Objects Americas, Inc.,[1] on that claim. The trade secrets misappropriation claim was tried by the court.

The plaintiff's misappropriation claim alleges that a number of its employees were hired away by Business Objects, S.A., and Business Objects Americas, Incorporated. As a result, some of these employees either took MicroStrategy trade secrets with them, solicited such secrets from friends still employed at MicroStrategy or other sources, or provided such information to Business Objects prior to departing from the company.

---

1. For purposes of this opinion and order, the court refers to the defendants as "Business Objects" and does so in the singular form. In other words, the court will refer to Business Objects as the "defendant."

Having carefully reviewed the record, the credibility of the witnesses, the parties' stipulations, and the applicable law, the court now makes its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. *FINDINGS OF FACT*

### A. Company Information

The plaintiff, MicroStrategy, Incorporated, founded in 1989, develops and sells business intelligence software and related maintenance, technical support, consulting, and training services to various organizations. Tr. Trans. at 161–65; 180–81 (Bedell Test.). The company competes primarily in the "high-end" segment of the business intelligence market. In 2002, MicroStrategy's revenue was $144 million. *Id.* at 161. MicroStrategy's principle place of business is McLean, Virginia. *Id.* During all times relevant to this case, Michael Saylor was the Chief Executive Officer of MicroStrategy; Sanju Bansal was the Chief Operating Officer of MicroStrategy; and Jeffrey Bedell was the Chief Technology Officer of MicroStrategy. The defendants, Business Objects, S.A., a French corporation, and its wholly owned subsidiary, Business Objects Americas, Inc., compete with MicroStrategy in the business intelligence software and services industry.

Business intelligence software allows companies to access and analyze the massive quantities of data that they accumulate in their daily operations, thereby increasing corporate efficiency and productivity. *Id.* at 163–65 (Bedell Test.). At the time of the events in question, MicroStrategy's perceived number one competitor in the high-end segment of the market was Business Objects. *Id.* at 185 (Bedell Test.); 885 (Saylor Test.).

In 2002, Business Objects' total revenues exceeded $450 million. *Id.* at 439 (Baillod Test.). Business Objects' princi-

ple place of business in the United States is San Jose, California. During all times relevant to this case, Bernard Liautaud was the Chief Executive Officer of Business Objects and Clifton Thomas Weatherford, Jr. was the Chief Financial Officer. Prior to 1999, Business Objects targeted a different, lower-end customer base than MicroStrategy. Subsequently, Business Objects began targeting the same high-end customer base that MicroStrategy historically had serviced. *Id.* at 588 (Bansal Test.).

MicroStrategy's trade secrets are its most valuable assets. *See id.* at 889–90 (Saylor Test.). MicroStrategy goes to great lengths to protect these valuable assets from unauthorized disclosure. *Id.* at 198–212 (Bedell Test.). MicroStrategy requires all of its employees to sign the MicroStrategy Agreement as a condition of their employment. *Id.* at 204. In pertinent part, the MicroStrategy Agreement provides:

3. *Confidential Information.* I agree that I have no right to disclose, or use for the benefit of myself or anyone other than MicroStrategy, any of the Confidential Information of MicroStrategy or MicroStrategy's Business Partners of which I become informed during my employment, whether or not developed by me. "Confidential Information" shall include, but not be limited to, MicroStrategy's technology and methodology regarding decision support, executive information systems, data warehousing, intelligent agent, networking, databases, modeling, strategy systems, strategy networks and simulation development; consulting techniques and methodology regarding any such technologies; any information regarding MicroStrategy's organization, personnel, quality standards, sales, financial, marketing, costs, profits, production, business plans, business strategies, the interrelation of any

such information, and the estimates of any such information regarding MicroStrategy's competitors; and any similar or related information of MicroStrategy or its Business Partners. Upon termination of my employment, I shall promptly deliver to MicroStrategy all Confidential Information which is in my possession or under my control.

4. *Conflict of Interest.* Upon termination of my employment, I am free to exercise in any capacity I chose those skills developed while working for MicroStrategy, provided, however, that:

 a. No Confidential Information of MicroStrategy or its Business Partners is utilized or disclosed in the process without first having received written permission from the owner of such proprietary information.

\* \* \* \* \* \*

6. *Survival.* I specifically acknowledge that this Agreement survives the termination of my employment and that any breach of this Agreement may result in the immediate termination of my employment and, in addition, subject me to liability for damages to MicroStrategy. I further acknowledge that MicroStrategy will be irreparably harmed by breach of any term of this Agreement and is entitled to seek immediate injunctive relief in any court of competent jurisdiction.

Ex. P57;[2] *see also* Tr. Trans. at 205–07.

MicroStrategy also distributes an Employee Handbook to all of its employees. Tr. Trans. at 201 (Bedell Test.). The pertinent sections of the Employee Handbook reiterate that a condition of employment is the agreement not to disclose any confidential information to anyone outside of

MicroStrategy. *See* Exs. P22; P66; Tr. Trans. at 202–04 (Bedell Test.).

MicroStrategy distributes its Information Security Policy to all employees as well. Tr. Trans. at 210 (Bedell Test.). The Policy provides in pertinent part: "Users shall not disclose MicroStrategy sensitive or confidential information to sources outside MicroStrategy except as expressly required by their job description." The Policy also states that "[u]sers shall protect and not disclose to third parties MicroStrategy's confidential information" and provides a list of such information, including marketing, sales, customer, and product information. Ex. P69. MicroStrategy distributed its Code of Conduct to all employees. Tr. Trans. at 208 (Bedell Test.). Relevant sections of the Code provide as follows:

### *Proprietary Information*

Proprietary and confidential information is valuable company property. Such information can include technical, business, financial and marketing data developed by or for MicroStrategy and not generally known to others. It can also include source and computer code, test results on new or modified software and any technical information and data pertaining to MicroStrategy software or its implementation/integration. This information may be contained in computer databases, internal Company communications, research notebooks, patent applications or a variety of other forms. If an employee develops or has access to such information, he or she should treat it as a valuable trade secret, regardless of whether it is marked "confidential."

\* \* \* \* \* \*

---

**2.** The plaintiff's exhibits will be preceded by a "P", and the defendant's exhibits will be preceded by a "D."

MicroStrategy will take all steps it deems necessary or desirable, including taking legal action, to protect its assets if proprietary information is wrongfully or inadvertently taken, disclosed or misused.

*Conflicts of Interest*

 \* \* \* \* \* \*

B. *Corporate Information.* Employees must avoid disclosing or using for personal benefit, or for the benefit of others, confidential and/or proprietary information acquired as a result of the employee's relationship with the Company. An employee can be held liable to the Company for any benefit gained from improper use of such information or any damages sustained by the Company as a result of improper disclosure of such information.

Ex. P68.

MicroStrategy utilizes a number of methods to maintain the secrecy of its proprietary information. It employs physical security, such as locked doors, limited access to its buildings through the use of badges, and the use of security cameras, to protect its corporate information and intellectual property. Tr. Trans. at 198 (Bedell Test.); 597 (Bansal Test.). MicroStrategy utilizes network-type security features, including firewalls and a virtual private network that can be accessed only by MicroStrategy employees to protect its electronic information. *Id.* at 198 (Bedell Test.). MicroStrategy enters into non-disclosure agreements (NDA) to protect trade secrets and other proprietary and confidential information that is disclosed outside the company, such as to a beta tester, customer, or prospect. *Id.* at 598 (Bansal Test.); Ex. P16 (referring to existence of an NDA). MicroStrategy protects against unauthorized use of its software products through the use of CD keys, which are only disclosed to authorized users. Tr. Trans. at 220–21 (Bedell Test.).

**B. The Earnings Restatement**

On March 20, 2000, MicroStrategy issued a press release announcing that it was restating its earnings for 1999. Tr. Trans. at 824 (Bansal Test.). Subsequently, MicroStrategy also restated its earnings for 1997 and 1998 as well. *Id.* at 619. As a result, the profits the company had reported for those years became losses. *Id.* The effect on the company's stock price was dramatic. The stock's value sank from a high of $313 per share to as low as $.49 a share. *Id.* at 831. MicroStrategy's difficulties were widely reported. As a result of such problems, the company laid off approximately ten percent of its employees in August of 2000. *Id.* at 832. In April of 2001, the company laid off approximately one-third of its remaining workforce. *Id.* at 836. Ultimately, the company's employment shrank by two-thirds as it closed down "non-core" businesses. However, it also had to lay off employees in its "core" business—business intelligence software. The restatement also affected the company's ability to get and retain business. Because of the company's financial instability, it was difficult for members of the MicroStrategy sales force to arrange meetings with prospective clients. Papp Dep. at 136.

From March 6, 2000—prior to MicroStrategy's restatement of earnings—to December 3, 2001, Business objects hired the following former MicroStrategy employees, most directly from the company: Michael Anthony, Jason Borens, Alexander Brown, John Ennis, David Fussichen, Jeffrey Heckler, Mitch Kamiel, Bill Kasinak, Suzanne Muccino, Thomas Papp, Katarzyna Peplinska, Paul Schmidt, Jeffrey Scudder, Leena Shah, Corey Sommers, Shad Syfert, and James Watson. Stipulated

Facts. Almost all of these former MicroStrategy employees came from that company's Chicago office, which was located in the same building as Business Objects' Chicago office.

### C. Business Objects' Acquisition of Information

During this time frame, Business Objects acquired constructive or actual access to a significant amount of MicroStrategy's proprietary and confidential information, including internal email, descriptions of software architecture, sales documents, competitive intelligence, and PowerPoint presentations. This information came through a variety of means. MicroStrategy employees would send information to their friends at Business Objects. *See* Tocanne Dep. at 88. The most important method was simply soliciting information about MicroStrategy and its products from new hires formerly employed at MicroStrategy. In at least one instance, a former MicroStrategy employee, John Ennis, took a large amount of proprietary information with him to Business Objects. Some of the information in Business Objects' possession may also have come through third parties—such as prospective or current MicroStrategy customers or industry analysts. However, no evidence of any concrete examples was introduced at trial to indicate when, if ever, this actually occurred.

The origin of much of the information is unknown. Business Objects employees had a habit of concealing their sources when forwarding such information within the company, often stating only that "a little bird" provided the information, or that they just happened upon the information. For example, in an email to the distribution list " Competitive Info" dated August 8, 2001, Business Objects employee Steve Moller attached a zip file named "Competitive presentations." Ex. P2. Mr. Moller stated in his email: "A little bird

delivered these presentations to me. . . . They were created by MicroStrategy . . . themselves. It could be valuable information when you're in competitive situations with them." *Id.*

The "little bird" appears to have also provided Business Objects information to MicroStrategy. *See* ex. D1054. In fact, the leaking of proprietary information amongst competitors in this industry appears to be quite common. Collecting intelligence on any competitor is an accepted practice in any industry when done properly—based on the aggregation of publicly available information.

Although MicroStrategy contends Business Objects had a "spy" inside MicroStrategy, this allegation rests on a use of that term in an email that was clearly intended to be playful. The spy reference was followed by a "smiley face" emoticon. *See* ex. P1. The spy in question was simply a friend of a Business Objects employee. Tocanne Dep. at 88. Such an exchange of information, while improper in many, if not most, instances, seems common in any industry and does not necessarily constitute the misappropriation of a trade secret. As noted, during the relevant time frame, MicroStrategy also was in possession of Business Objects information.

### D. Specific Instances Where Information Was Acquired

#### 1. *The Internal MicroStrategy Email*

On April 3, 2001, MicroStrategy's CEO Michael Saylor authored an internal email sent to all MicroStrategy employees that was eventually circulated within Business Objects. Ex. P1. The contents of the email, which included details related to MicroStrategy's restructuring plans, were considered "extraordinarily sensitive" to the company. Tr. Trans. at 895 (Saylor Test.). Due to press reports about MicroStrategy's restructuring, Mr. Saylor

felt it was his responsibility to share the inner thinking and plans of MicroStrategy's senior management team with the company's employees. *Id.* at 896. Mr. Saylor did not intend for this email to be distributed outside of MicroStrategy. *Id.* at 895. Mr. Saylor testified that Business Objects' acquisition of this internal MicroStrategy email was "devastating." *Id.* at 897.

The email was received by Francis Jayakumar from his friend at MicroStrategy, the alleged "spy." Jayakumar forwarded it to Jerome Tocanne and Business Objects' Vice President of Marketing, Dave Kellogg. Tocanne Dep. at 69–70. Jerome Tocanne then circulated the internal MicroStrategy email to all Business Objects staff in the western region, as well as to the Vice President of Competitive Intelligence at Business Objects, Matthew Sell. *See* ex. P1.

### 2. *The Hiring of Thomas Papp*

Phil Maloney, Vice President of the Central Region for Business Objects Americas, and Brian Baillod, a Director at Business Objects, were primarily responsible for recruiting the Chicago office MicroStrategy employees. Baillod worked out of the Chicago area. Maloney recruited Thomas Papp from MicroStrategy. *See* Papp Dep. I at 129–33. Papp was in sales at MicroStrategy. *Id.* at 32. Maloney had known Papp and had attempted to recruit him to other companies prior to joining Business Objects. Maloney and Papp met for lunch in early to mid March, 2001, where Maloney asked what it would take to get Papp to leave MicroStrategy. Papp Dep. I at 129; *see also* ex. P12. Papp was perhaps the most important hire from MicroStrategy.

On March 15, 2001, while still an employee of MicroStrategy, Papp sent Maloney a confidential MicroStrategy document entitled "How to Compete Against Alpha-Blox—Draft." Ex. P7; Papp Dep. I at 161; Maloney Dep. at 86–93. AlphaBlox was, in some respects, a MicroStrategy competitor. In his email, Tom Papp stated: "You should be talking to these guys, they are getting good reviews from the analysis community. They are talking to us about a partnership." Ex. P7. Both Papp and Maloney agreed that it was wrong to send this MicroStrategy confidential competitive analysis to Business Objects. Papp I Dep. at 16, 167–68, 178–80; Maloney Dep. at 78. Maloney could not think of a single circumstance in which it would be appropriate for a MicroStrategy employee to inform Business Objects of a business opportunity. Maloney Dep. at 93. Business Objects CEO Bernard Liautaud testified that it was inappropriate for Papp to send this information to Maloney. Liautaud Dep. at 150.

Tom Papp accepted employment at Business Objects on April 3, 2001. *See* ex. P75. He submitted his two-weeks notice to MicroStrategy on April 5, 2001. Prior to formally telling MicroStrategy that he was leaving, other members of the sales staff knew Papp was leaving. Several sent him their resumes to forward to Business Objects, which he did. These employees, Dave Fussichen and Katerina Peplinska, were eventually hired. Alex Brown was copied on Peplinska's email to Papp. He too ended up at Business Objects shortly after Papp. *See* Papp Dep. I at 367–75.

Papp had his exit interview on April 19, but did not start work at Business Objects until around the end of that month. Papp Dep. I at 233. On April 12, 2001, however, while still technically a MicroStrategy employee, Tom Papp gave a presentation to Business Objects employees on MicroStrategy's selling strategies and techniques, which also may have included Papp's personal insights regarding his sales experience. *See* ex. P6. MicroStrategy's CEO,

Michael Saylor, claimed the company spent years honing its selling techniques, which it employed during the time frame of 1999 to 2001. Tr. Trans. at 900 (Saylor Test.). He testified: "[W]e had developed a technique for selling and for supporting accounts in the high end of the market. . . . [W]e took a very industrial approach. That meant that we would bundle services into the sales cycle. We couldn't just sell the technology, we had to provide a skilled person to make sure it was properly configured. . . . [T]he way we communicated with the customer and the way we positioned the software was very, very different." *Id.* at 898–99. MicroStrategy engaged heavily in proof of concepts (POCs). A POC is a common method in the software industry and would involve installing and running software, like MicroStrategy's products, on a prospective customer's computer system for a few days or even weeks. The intent was to show the prospect what could be done with their system using the software. *See id.* at 594 (Bansal Test.). MicroStrategy apparently often paid for the cost of such POCs as well. MicroStrategy also encouraged its sales people to bring customers to MicroStrategy headquarters to visit with executives. *Id.* Additionally, MicroStrategy would highlight its support staff in sales cycles. *Id.* at 595–96.

In an email regarding "MicroStrategy and Solution Selling" dated April 13, 2001, Business Objects Senior Director Steve Becker wrote: "Yesterday Dino [Zicarini] and I saw a presentation from MicroStrategy's # 1 Sales Rep. Over the last 3 years this person has closed over $18 Million with MicroStrategy. He gave some thoughtful insights as to how MicroStrategy tries to sell into their customers. . . . *Please do not let this email go outside the company.*" Ex. P6 (emphasis in original). Becker went on to list the major points of the presentation: solution selling, site visits to corporate, executive visits to custom-

ers, calling high into sales calls, great technical support, paid POCs, and selling the MicroStrategy vision to customers. *Id.* This email was sent to Business Objects' enterprise customer management staff, Vice President of Marketing Dave Kellogg, and six other Business Objects employees. *Id.* Kellog then forwarded the email to other Business Objects executives, CEO Bernard Liautaud, stating: "great note from steve. a must read." *Id.*

On April 16, 2001, Business Objects CEO Bernard Liautaud responded to Business Objects executives Dave Kellogg, John Powell (Vice President of Sales), and Jon Temple (Head of North American Operations) with a directive that Business Objects implement this "new way of selling":

I would like to discuss at the next EC [Executive Committee] how we are going to implement this new way of selling.

— New marketing tools for sales people (we need to build a different ppt [PowerPoint] presentation)

— Training our people on how to sell this way (BOU [Business Objects University]? specific training? What methodology?)

— More systematic consulting sales along with the software

— Different marketing programs to reach higher level audiences

— Paid POCs [Proof of Concept]

— Executive / corp visits (In the past year, I have not been exposed to more than 5 customers in the SK office. It should be one per week)

Please be ready to discuss on the 23rd of April for our EC.

*Id.; see also* Liautaud Dep. at 24–25, 27, 49–52.

Business Objects' Executive Committee did in fact discuss Mr. Papp's presentation and the points raised in Mr. Liautaud's

email at its meeting in Paris on April 23. (Liautaud Tr. at 47–48, 53–54). Some debate exists as to whether Business Objects had previously employed solution selling. *Compare* Tr. Trans. at 1045 (Weatherford Test.) *with id.* at 1089 (Cretny Test.). For purposes of this opinion, this apparent conflict need not be resolved. What is clear is that in the fourth quarter of 2001, Business Objects spent $3 million on a consultant to teach solution selling to the entire Business Objects sales force. *Id.* at 1044–45 (Weatherford Test.). Papp claims the selling method was his own and one he had been using for many years. Papp Dep. I at 48. About the same time Papp was leaving for Business Objects, John Ennis was also departing.

### 3. *John Ennis*

John Ennis worked for MicroStrategy as an account manager. He worked closely with Papp during that time. Ennis and Papp apparently spoke often about their planned departure in March, while still employed at MicroStrategy. The arrangement seems to have been that when the two left, Ennis would be working for Papp at Business Objects. On March 14, 2001, Ennis sent an email from his MicroStrategy account to Phil Maloney at Business Objects. Ex. P12. Ennis wrote: "I assume, consistent with what we have been discussing, I would be reporting directly to Tom [Papp] . . . ." *Id.* Ennis further stated: "As discussed, I will be leaving a lot of business on the table with nothing ($) to show for it. I'll do all I can to swing business and will be glad to discuss particulars of how we can manage opportunities—if you'd like. Thank you in advance for doing all that you can to assemble the right package . . . !" *Id.* Mr. Ennis' testimony that he could not recall what he meant by the phrase "swing business" is not credible. *See* Ennis Tr. at 179. Business Objects sent a formal offer letter to John Ennis on March 16, 2001, ex. P175,

and he accepted employment on March 24, 2001. Ennis Dep. at 88–89.

On April 4, 2001, after Mr. Ennis had accepted employment at Business Objects, he forwarded three internal MicroStrategy technical documents regarding MicroStrategy products to Tom Papp. At this time, Papp had also decided to leave MicroStrategy for Business Objects, but had not yet announced his intentions. *See supra.* The first document was technical document entitled "Narrowcast Server 7.0 Tuning Guidelines" to Papp. Ex. P83. The second document, Ex. P82, was marked "FOR INTERNAL USE ONLY." The third document, ex. P81, was entitled "MicroStrategy Narrowcast Server System Sizing Information" and was marked "MicroStrategy Inc. Internal Only, Not for Distribution" on the bottom of each page. There is no evidence as to why these documents were forwarded to Papp. The documents apparently were recovered for purposes of this litigation from Ennis' Business Objects laptop computer.

On April 4, 2001 at 10:41 AM, Ennis forwarded from his MicroStrategy computer to his personal email account two MicroStrategy technical documents: (1) "MicroStrategy Narrowcast Server: Proactive Report Delivery and Alerting," and (2) "User Guide for Narrowcast Server Resource Calculator," which was marked "FOR INTERNAL USE ONLY." Ex. P149.

Ennis also emailed numerous MicroStrategy documents to his personal email account and transferred them to his Business Objects computer. Ennis Dep. at 74. Ennis testified that he emailed MicroStrategy documents to his personal email account, copied the important materials onto a floppy disk and possibly a CD, and then transferred them onto his Business Objects computer. Ennis Dep. at 74–75, 79, 81.

For example, in late March, 2001, Ennis forwarded from his MicroStrategy computer to his personal email account MicroStrategy documents related to an account called U–Bid. Ex. P32; Ennis Dep. at 209. The documents included draft agreements between MicroStrategy and U–Bid, which contained MicroStrategy pricing information, and a draft Statement of Work. Ex. P32; Ennis Tr. at 213. He forwarded similar information relating to other accounts, including Johnson Wax Professional, ex. P124; Ennis Dep. at 226–28; Caterpillar, ex. P128; Ennis Dep. at 261–62; Kimberly Clark, ex. P131; Ennis Dep. 276–77; and Kraft Foods, ex. P133; Ennis Dep. at 288–89.

On March 23, 2001, Ennis forwarded from his MicroStrategy computer to his personal account MicroStrategy information related to a company called W.W. Grainger. Ex. P138; Ennis Dep. at 327–28. On his first day at Business Objects, April 16, 2001, Ennis provided information regarding W.W. Grainger to Business Objects by sending an email to Phil Maloney attaching an analysis of W.W. Grainger, prepared by FutureNext, in which Ennis stated that he had not pursued any business with that company while still at MicroStrategy. Ex. P152; Ennis Dep. at 335–38, 341. Attached to the email was a Word document entitled "GR_Prospect-Log," an opportunity brief that John Ennis received while at MicroStrategy. The brief was prepared by an employee at a company called FutureNext, a MicroStrategy "partner." See Ennis Dep. at 337. Phil Maloney forwarded this email and attachment to Corey Severyns, stating: "This came from John—looks great!" Ex. P152.

Ennis copied a number of other proprietary MicroStrategy documents detailing information relating to the company's actual accounts, prospective accounts, and partners, as well as information regarding MicroStrategy's software and sales information. See, e.g., ex. P33–P37. A document produced by Business Objects, a "target accounts list," developed by MicroStrategy and its partner ThinkFast, is also attributable to Ennis, although it was sent as part of an internal MicroStrategy email to Tom Papp as well. See ex. P17. Another document in Business Objects' possession as a result of Ennis' acts is one entitled "The Technical Architecture of MicroStrategy: The Platform for Intelligent E–Business." Ex. P15; P16; see Ennis Dep. at 286–87. The document was marked "MicroStrategy Confidential—Information is provided under non-disclosure agreement only." Ex. P15; P16. This document provides a detailed description of the "process flows and the functional workings of MicroStrategy's product line." Tr. Trans. at 217 (Bedell Test.). The copy Ennis received from MicroStrategy was attached to an internal MicroStrategy email that stated: "This document is confidential and is meant for distribution to customers/prospects who are under NDA [non-disclosure agreement]." Ex. P15.

Ennis also took a target account list with him that had been emailed to himself and Thomas Papp, among others. Ex. P17. MicroStrategy considered this particular account list to be confidential. Tr. Trans. at 646–47 (Bansal Test.). It was also a list that took some effort to develop—it was not simply a list of companies that did not yet use MicroStrategy software. Not every company was using business intelligence software and time and resources were expended to determine what companies might be interested in buying this type of software. Id. at 642. MicroStrategy's Chief Technology Officer Jeff Bedell also testified that this document contained confidential information. Id. at 218 (Bedell Test.). He stated further that a competitor in possession of this document would have a much better un-

derstanding of how MicroStrategy's product line worked. That competitor could use that information to fine tune the marketing of their own products or actually improve on those products. *Id.; see also id.* at 908–09 (Saylor Test.).

Business Objects CEO Bernard Liautaud testified that John Ennis' conduct was inappropriate. Liautaud Dep. at 258. Ennis was eventually terminated for his actions once this lawsuit was filed and it was discovered that these documents were in his possession.

4. *Alex Brown*

Simultaneously to Papp's departure, Alex Brown also left MicroStrategy. Alex Brown worked in pre-sales for MicroStrategy out of its Chicago office, like most of the other individuals recruited to work for the defendant. On April 5, 2001, Alex Brown formally accepted employment with Business Objects and signed the Business Objects Proprietary Information Agreement. Ex. P167; Brown Dep. I at 76–78, 155–57. However, Mr. Brown stayed at MicroStrategy for another three months. Brown Dep. I at 78–79. During this time, he did not advise anyone at MicroStrategy that he had already accepted employment at Business Objects. *Id.* at 114. When asked whether he was leaving by Josh Goldman, he was "noncommittal," stating only that he could not give his assurances that he would not seek alternative employment. *Id.* at 116. Brown's failure to switch employment promptly after accepting a position with Business Objects derived from the fact that he was in the United States on a work visa. Had he ceased employment prior to obtaining a visa for his new job, he would have been deported. *Id.* at 117.

After Alex Brown accepted employment with Business Objects, yet while he was still employed by MicroStrategy, Brian Baillod invited him to attend a meeting of Business Objects personnel at a resort in Fort Lauderdale, Florida. Ex. P10; Brown Dep. II at 21. Alex Brown was listed on the attendee list for the meeting. Ex. P10. The court need not determine whether Brown actually attended, which he denies; however, evidence suggests that he did.

While at Business Objects, Brown provided information to a number of Business Objects employees when asked for details regarding MicroStrategy's products. Brown Dep. I at 175–180. Additionally, Leena Shah solicited a CD Key to MicroStrategy software, which he provided. Tr. Trans. at 462, 465 (Shah Test.); ex. P695.

5. *Shad Syfert*

Business Objects Director Brian Baillod read a MicroStrategy competitive intelligence report on "Ithena" a Business Objects division providing specific products in the business intelligence industry. Shad Syfert, a MicroStrategy employee, allegedly brought this document with him when he interviewed for a position at Business Objects. *See* ex. P40 ("I interviewed a MicroStrategy fellow today who we are most likely going to hire. To prepare for his interview he spent a lot of time reviewing their competitive intelligence on our product which he brought with him . . . ."); *see also* Tr. Trans. at 331–32 (Baillod Test.). This document was not produced at trial.

Despite Baillod's testimony that he had not read the position paper addressing Ithena, the evidence indicates that he did so. Particularly, his email describing the incident, ex. P40, notes that the names of Ithena personnel were listed at the top of the paper. In fact, even the recipients of his email believed he had read the report as one recipient asked for a copy of it. *Id.*

While he claimed the paper contained confidential Business Objects information,

his email indicates no such thing. The email is primarily concerned with the fact that it quoted two Ithena employees extensively and Baillod cautioned them about giving out such information given the use that could be made of it by competitors. He did not caution them about not giving out "confidential" information. The inference to be drawn from the follow-up responses in this email string is that MicroStrategy personnel had been assessing Ithena closely at trade shows.

Business Objects CEO Bernard Liautaud testified that it would be inappropriate during an interview for a Business Objects employee to discuss or review competitive intelligence belonging to the candidate's current employer. Liautaud Dep. at 204, 206, 209. Business Objects Director Brian Baillod conceded that he would not be free to give Business Objects' competitive intelligence reports to competitors: "[I]t wouldn't make sense to give that to a competitor." Tr. Trans. at 318 (Baillod Test.). Except for Baillod's very general email discussing the document, no testimony was presented regarding its contents, whether it included any information in addition to what might have been gained at a trade show, or whether it had any economic value at all to anyone.

Syfert was also in possession of a number of MicroStrategy training manuals as well as his MicroStrategy employee handbook when he started work at Business Objects. *See* exs. P22, 24–28. The court finds credible his testimony that such materials were not required to be returned to MicroStrategy once he finished employment and that these items sat, essentially discarded, in his basement until Business Objects came to him requesting information as part of its discovery obligation in the instant litigation. *See* Tr. Trans. at 1140–41 (Syfert Test.).

### 6. Corey Sommers

Sommers was a former MicroStrategy employee hired by Business Objects in March 2001. *See* ex. P405. While at MicroStrategy, Sommers served as a sales consultant and also worked on competitive intelligence. Sommers Dep. at 62. Sommers was placed in charge of competitive intelligence on MicroStrategy for Business Objects. As part of that job, Sommers solicited internal MicroStrategy documents. He also requested information from new hires who had worked for MicroStrategy and compiled reports based on his own experiences working for the plaintiff.

Two months after starting at Business Objects, Corey Sommers drafted the "MicroStrategy Recommended Sales Strategy." Ex. P555. This document contained a section listing MicroStrategy's selling points. Sommers Dep. at 244–45. Sommers learned these key selling points as a MicroStrategy employee. *Id.* at 245. On June 11, 2001, Corey Sommers circulated a draft of this document widely throughout Business Objects. Ex. P555.

On August 29, 2001, Corey Sommers obtained MicroStrategy's volume discount schedule from a source he described as "a little bird" and forwarded this information to other Business Objects employees. Ex. P3; Sommers Dep. at 144; Ex. P695–A. MicroStrategy's volume discount schedule was also included in course materials for Business Objects University, an internal organization responsible for training all Business Objects employees. Tr. Trans. at 505 (Shah Test.).

Sommers believes he obtained this document from a customer. Sommers Dep. at 145–47. Other testimony indicates MicroStrategy's volume discount schedule is proprietary and confidential information that is not disclosed outside the company. Tr. Trans. at 646–48 (Bansal Test.); 917 (Saylor Test.) (characterizing it as "hyper-

confidential"). Sommers testified that he believed this type of information was regularly available in the OLAP Report, an industry publication. Sommers Dep. at 148. However, he later stated that the information was "maybe more current" than that which might be found in the OLAP report, indicating this was not a document that was publicly available at the time it was disclosed. *Id.* at 152.

As Sommers testified, MicroStrategy's volume discount schedule was a "valuable piece of competitive intelligence," which assisted Business Objects' sales staff in understanding MicroStrategy's pricing. *Id.* at 152–53. A competitor in possession of such pricing information would be able to undercut MicroStrategy. Tr. Trans. at 916–17 (Saylor Test.).

As instructed by Matthew Sell, Business Objects' Vice President of Competitive Intelligence, Corey Sommers drafted the "MicroStrategy TCO [Total Cost of Ownership] White Paper." *See* Exs. P84; P407. On September 26, 2001, Corey Sommers circulated a draft of this white paper to former MicroStrategy employees Leena Shah, Tom Papp, David Fussichen, and Jeff Scudder to obtain their "feedback." Ex. P84. Corey Sommers stated: "I believe this may be a good 4th-quarter response to the low level, technical attack document that MicroStrategy has circulated to all potential customers looking also at Business Objects. The white paper focuses on business and TCO issues rather than getting mirred [sic] in feature/function." Ex. P84. He further stated that the draft "contains competitive items that are not disputed by MicroStrategy, several of which are even admitted to in their own attack document. These items happen to be resonating quite well with customers and have helped swing some deals over to us." *Id.*

Corey Sommers obtained a proprietary and confidential MicroStrategy document, which he described as a "MicroStrategy anti-BO FUD" document. Ex. P695–I. Every page of this document was marked "MicroStrategy Incorporated Confidential and Proprietary—Unauthorized use, disclosure, or duplication is strictly prohibited." *Id.* It was, however, a "simplified version" of a document that had been "going around." *Id.* Leena Shah included information from this document, verbatim, in her Business Objects University course materials. *See* ex. P530.

Most importantly, Sommers also acquired a 44–page MicroStrategy document entitled "Business Objects Competitive Recipe." Ex. P5; Sommers Dep. at 199. The header of each and every page stated, "Comprehensive Competitive Analysis—Business Objects" and every page of the document was marked "MicroStrategy, Inc. Confidential." Ex. P5. The document described the means by which MicroStrategy could compete with and beat Business Objects.

MicroStrategy's CEO Michael Saylor described the contents of the "Competitive Recipe" as "everything that we as a company learned over the course of competing with Business Objects for about seven or eight years, plus everything we learned about what was critical to our customers." Tr. Trans. at 902 (Saylor Test.). As Saylor testified, hundreds of people had input into this "very critical" document. *Id.* at 903. MicroStrategy's competitive intelligence team prepared the "Competitive Recipe" with input from MicroStrategy's CEO Michael Saylor, COO Sanju Bansal, account executives, sales consultants, technical engineers, and customers. *Id.* at 624–26 (Bansal Test.); 903 (Saylor Test.).

The "Competitive Recipe" outlines, among other things:

(a) key themes to portray to customers, which were derived from interviews

with people in the field and customers;

(b) traps MicroStrategy account executives should set for Business Objects-in other words, which weaknesses of Business Objects the account executive should draw the customers' attention to; and

(c) MicroStrategy's weaknesses so that the field staff can anticipate traps that Business Objects may set. *Id.* at 634–40 (Bansal Test.).

MicroStrategy's COO Sanju Bansal testified that the "Competitive Recipe" is "amongst the most sensitive of all MicroStrategy information, and probably would rank right up there ... with the source code of product [sic] itself." *Id.* at 627. Mr. Bansal explained the harm to MicroStrategy resulting from Business Objects' acquisition of the "Competitive Recipe" document: "[I]f you had the document and you were competing with somebody you could anticipate their every play, their every move, and therefore, you could, before they even made the move, sort of negate the effect of that move or negate the effect of that play." *Id.* at 653. Saylor testified that the document had three primary values to Business Objects: (1) It would let them know what flaws their product had; (2) Business Objects could change its marketing message to downplay such flaws; or (3) the company could alter its sales cycle to counteract these weaknesses. *Id.* at 903–04 (Saylor Test.).

To protect the "Competitive Recipe" against unauthorized disclosure, MicroStrategy limited the distribution of the document within the company to employees on a need to know basis. *Id.* at 627–28 (Bansal Test.). MicroStrategy did not authorize disclosure of the "Competitive Recipe" to Business Objects. *Id.* at 628. Nor did MicroStrategy give the "Competitive Recipe" to any of its customers, not even to those with an NDA. *Id.* MicroStrategy did provide a copy of the "Competitive Recipe" to the Gartner Group, an industry analyst with whom MicroStrategy has a consulting arrangement and an NDA. *Id.* at 630–31. The document was provided to the Gartner Group in confidence as a resource for understanding how MicroStrategy compares with Business Objects and to obtain feedback on its contents. *Id.* at 632. There is no evidence that the Gartner Group distributed this document outside of the company. While Business Objects implied that its receipt of the Competitive Recipe came via the Gartner Group, it offered no evidence to support this inference. Furthermore, the defendant concedes that the version of the Competitive Recipe given to the Gartner Group was different from the version in its possession. *See* Closing Argument of Business Objects, S.A. and Business Objects Americas, Inc. at 10. There is nothing to suggest that the Competitive Recipe was ever made publicly available and Bansal testified that he had never seen anything from the "Competitive Recipe" appear in a Gartner publication. Tr. Trans. at 633 (Bansal Test.).

On October 29, 2001, Corey Sommers emailed MicroStrategy's "Competitive Recipe" to several dozen Business Objects employees, including Vice President of Marketing Dave Kellogg and Director of Consulting Brian Baillod. Ex. P5; Sommers Dep. at 196–200. In his email, Mr. Sommers described the "Competitive Recipe" as "an internal sales doc, not something a customer would get" that was "overwhelming in its thoroughness." Ex. P5. Mr. Sommers suggested that Business Objects could use this document to "make MicroStrategy look like fools with the technical decisionmakers." *Id.*

There is no record that any of the recipients of this document, which included members of upper management such as

Dave Kellog, Vice–President of Marketing, expressed any concern that Sommers had obtained and circulated this document. *See* Tr. Trans. at 324, 325 (Baillod Test.); Sommers Dep. at 244. Business Objects CEO Bernard Liautaud admitted that he would not want MicroStrategy to have a copy of a Business Objects document that explained how to beat MicroStrategy in the marketplace. Liautaud Dep. at 197.

### 7. *Leena Shah*

In April 2001, Business Objects also hired former MicroStrategy employee Leena Shah to work in the Atlanta office as a Technical Instructor in Business Objects University. Tr. Trans. at 441, 450–51 (Shah Test.). As a Business Objects employee, Leena Shah was given responsibility for developing and delivering competitive workshops on MicroStrategy to Business Objects sales and presales employees throughout North America and Europe. *Id.* at 453. In order to create these workshops, Ms. Shah actively solicited and obtained information from a variety of sources concerning Business Objects competitors, which she then incorporated into her presentations. *See, e.g.,* ex. P695 (series of exhibits). That information often came from anonymous sources as well as former and current MicroStrategy employees. *See, e.g.,* ex. P530; Tr. Trans. at 467–68 (Shah.Test.). She even continued to solicit ex-MicroStrategy employees for information after the instant litigation had been filed and the Chicago office of Business Objects had been made "off limits" to such queries as a result of this litigation. Tr. Trans. at 477–78 (Shah Test.); ex. P695 (series). Finally, as noted above, other Business Objects employees, like Corey Sommers, would forward information they had obtained to her and she would incorporate that information into her training material.

Often, her solicitation of information was at the behest of Business Objects executives. For instance, on September 21, 2001, Richard Nicol, Vice President of Business Objects University, directed Leena Shah to solicit information concerning MicroStrategy from former MicroStrategy employees Alex Brown, James Watson, and John Ennis: "[P]lease find a suitable way for discussing in detail the contents [of the MicroStrategy competitive workshop] with these three people and let me know what the reactions are." Ex. P695–H. Leena Shah did contact these individuals and asked for an outline of MicroStrategy's sales demonstrations and questioned them regarding the technical capabilities of MicroStrategy products. *Id.*

On September 25, 2001, Alex Brown responded to Leena Shah's questions. Mr. Brown provided information related to the then-unreleased MicroStrategy 7.2 software, including functionality, the original code name, and the release date: "A little birdie told me that 7.2 got pushed to Q1." *Id.* Mr. Brown provided very general comments on the overall MicroStrategy web architecture and browser functionality. *See* Tr. Trans. at 467 (Shah Test.). Mr. Brown answered Ms. Shah's questions on technical capabilities of MicroStrategy products and product features: MicroStrategy now has a "complete UNIX web SDK that it is architecturally identical to the Windows Web SDK," and "[t]here is supposed to be a full UNIX Web front-end soon." Ex. P695F.

Shah also sought and obtained encryption keys to a variety of MicroStrategy software products. She most vigorously pursued a beta copy of MicroStrategy latest product, version 7.2, but the record offers no evidence that she ever succeeded.

On September 24, 2001, Ms. Shah asked Katarzyna Peplinska, a former MicroStrategy employee who worked in Business Objects' Chicago office, to send her a MicroStrategy CD key. Ex. P695–C. On

that same day, Ms. Peplinska sent Ms. Shah the CD key for MicroStrategy 7GA, MicroStrategy 7 SP1, MicroStrategy7 SP2, MicroStrategy 7.1 RC, MicroStrategy 7.1 GA (includes Administrator), Narrowcast Server, MicroStrategy 7.1.1 with OLAP Provider, and MicroStrategy 7.1 Beta 3 with OLAP Provider. *Id.* MicroStrategy Chief Technology Officer Jeff Bedell confirmed that these were in fact MicroStrategy's CD keys for the listed products. Tr. Trans. at 226 (Bedell Test.). MicroStrategy COO Sanju Bansal testified that MicroStrategy would never license its software products to Business Objects. Tr. Trans. at 673 (Bansal Test.).

On September 25, 2001, Ms. Shah asked former MicroStrategy employees Alex Brown, James Watson, and John Ennis for a CD key to MicroStrategy 7.1.1. Ex. P695–G. Alex Brown responded: "[Y]ou never know and I never told you—the enterprise key is 527528737–MST5L." *Id.*

Leena Shah met with former MicroStrategy employee Suzanne Muccino on January 8, 2002, so that Shah could obtain information on new MicroStrategy product offerings: "[I] need to pick your brain about some MicroStrategy stuff ... especially the likelihood or ability to get a hold of a copy of version 7.2." Ex. P695–K. Leena Shah needed this information to update Business Objects University course materials. Tr. Trans. at 487 (Shah Test.). Muccino began working at Business Objects' Atlanta office as an account manager on December 10, 2001. Tr. Trans. at 481–82; Stipulated Facts 27 & 28. Ms. Shah obtained information concerning MicroStrategy at this meeting and then scheduled a "longer meeting to get more of an insight on the Sales Strategy side of things at mstr." Ex. P695–L.

On January 8, 2002 at 9:13 AM, Shah advised Ozlem Atmaca of Business Objects that she had obtained information on new MicroStrategy product offerings from Ms. Muccino and that she would continue her efforts to obtain information from former MicroStrategy employees: "[I] have got some information from Suzanne Muccino— but will meet with her for a longer meeting to get more of an insight on the Sales Strategy side of things at MicroStrategy. [S]he also gave me something that will help with v7.2 stuff." Ex. P695–L; Tr. Trans. at 488 (Shah Test.).

At 10:34 AM, Shah wrote to Business Objects employee Thomas Burnes: "I have got my hands on the new product improvements for v7.2." Ex. P695–M. Ms. Shah then quoted verbatim from a document entitled "What's New in MicroStrategy 7.2." *See* exs. P14; P695–M; Tr. Trans. at 490 (Shah Test.). Ms. Shah later covered these new MicroStrategy product improvements in courses she taught to Business Objects employees on how to compete against MicroStrategy. Ex. P695–M; Tr. Trans. at 491 (Shah Test.).

At 10:48 AM, Leena Shah sent a second email to Thomas Burnes of "high importance." Ex. P695–N. Ms. Shah stated: "something more comprehensive which I am sure will be of use, and also suggests that they did not have in v7.1 as this is coming from the new features of v7.2 document." *Id.* Ms. Shah then quoted two paragraphs verbatim from the "What's New in MicroStrategy 7.2" document. Ms. Shah closed her email by stating: "Tom, please keep this purely internal and confidential. It is a document that just happened to fall into my hands. Please keep for your own information until it has been decided exactly how we are going to use this info in our course and through the company in general." *Id.* 695–N.

Later that same day at 4:59 PM, Shah wrote to John Hawkins, District Technical Manager for the West Central Region: "I have managed to get my hands on a copy of a document that lists the new features

of v7.2—[I] have only just got it so [I] need to get it in a non-MicroStrategy form before circulating." Ex. P695–O. Ms. Shah admitted that there would be no need to convert publicly available information into a non-MicroStrategy form before circulating it. Tr. Trans. at 548 (Shah Test.). As this chain of emails make clear, at their meeting on the morning of January 8, 2002, Muccino provided proprietary information concerning the new features for MicroStrategy 7.2 prior to its release.

Also on January 8, 2002, Leena Shah indicated that she was going to meet with Business Objects market analyst Kate McNeel the following week. Ex. P695–L. On February 8, 2002, Kate McNeel circulated the "What's New in MicroStrategy v.7.2" document throughout Business Objects: "Attached is a doc which lists new features in MicroStrategy version 7i, which is currently in Beta, and due for GA release in the next 2 months." Ex. P14. Shah had provided to McNeel the document she had received from Muccino the day before. *See* ex. P695–L. MicroStrategy 7.2, also known as MicroStrategy 7i, was not released until April 2002. Tr. Trans. at 214 (Bedell Test.).

Jeffrey Bedell testified that MicroStrategy treats the new features of unreleased software as confidential information. Tr. Trans. at 255–56 (Bedell Test.). However, it was clear that in a press release announcing the launch of beta testing of an earlier version of the software, MicroStrategy 7.1, some of the product's features were made public. *See id.* at 274–75; ex. D1032.

## II. *CONCLUSIONS OF LAW*

In deciding whether any of the information disclosed in this case constituted trade secrets and whether Business Objects' receipt of such information constituted misappropriation of trade secrets, the court must be careful not to constrain legitimate competitive practices. It is apparent that in this industry, as perhaps in all others, a large amount of confidential information makes its way into the public domain eventually. It is also clear that because the software industry moves quite rapidly, what might have been a confidential trade secret yesterday is merely public competitive intelligence tomorrow. In the instant case, the important actors obviously considered much of this information to be fair game. As one Business Objects employee put it, "this happens in the industry . . . . You constantly get the other side's competitive intelligence. It's part of the game." Sommers Dep. at 224. At some point, however, a line can be crossed, and it is clear to the court that the present case evinces some instances where that occurred.

## A. Requirements of the Virginia Uniform Trade Secrets Act

The tort of misappropriation of trade secrets is codified in the Virginia Uniform Trade Secrets Act (VUTSA), Va.Code Ann. §§ 59.1–336 to 59.1–343. The Act defines this tort as:

1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or 2. Disclosure or use of a trade secret of another without express or implied consent by a person who [u]sed improper means to acquire knowledge of the trade secret; or [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was [d]erived from or through a person who had utilized improper means to acquire it; [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or

limit its use; or [a]cquired by accident or mistake.

Va.Code Ann. § 59.1–336.

The Act defines a trade secret as

information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.*

■ Acquisition through "improper means" includes acquisition through "theft, bribery, misrepresentation, breach of a duty or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* This list is non-exhaustive. In light of this statutory language, there are two components to the plaintiff's claim: (1) the information in question must constitute a trade secret, and (2) that trade secret must have been misappropriated.

1. *Trade Secret Status*

■ With regard to trade secret status, the information must be of a subject matter entitled to trade secret protection, must have independent economic value as a result of not being generally known and not being readily ascertainable by proper means; and reasonable efforts must have been taken to maintain its secrecy. The case law is clear that just about anything can constitute a trade secret under the right set of facts. Few classes of information are per se excluded from trade secret protection, patented subject matter being the most obvious example. The list of information eligible for trade secret status detailed in the VUTSA is not exhaustive.

In the present case, practically all of the information the plaintiff claims constitutes trade secrets is proper subject matter: customer lists, pricing information, marketing and sales techniques, information about products, etc. *See* James Pooley, *Trade Secrets* § 6.02 (2004). In other words, under the right set of circumstances, each category of information could be a trade secret. For example, a customer list, or a method of selling or marketing *could* be a trade secret. The question is whether the facts present in the instant case serve to elevate such information to the status of trade secrets.

■ Simply because information is disclosed outside of a company does not result in the loss of trade secret status. " 'The secrecy need not be absolute; the owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied.' " *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F.Supp.2d 565, 574 (E.D.Va.2004) (quoting *Dionne v. Southeast Foam Converting & Packaging, Inc.*, 240 Va. 297, 397 S.E.2d 110, 113 (1990)). Furthermore, the requirement that the information not be generally known refers to the knowledge of other members of the relevant industry—the persons who can gain economic benefit from the secret. *See* Uniform Trade Secrets Act, § 1, comment. Finally, only reasonable efforts must be taken to maintain secrecy. Restricting access to information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable efforts.

■■ Perhaps most importantly, in order to have economic value, a trade secret must not be readily ascertainable through legitimate means. If a competitor could easily discover the information legitimately, the inference is that the information

was either essentially "public" or is of de minimus economic value. The Commentary to the Uniform Trade Secrets Act, upon which the VUTSA is based, provides a number of proper means by which one could learn a trade secret. Most relevant to the instant case are the examples where one observes the product on public use or display or one reviews publicly available literature. What constitutes *readily* ascertainable through proper means is heavily fact-dependent and simply boils down to assessing the ease with which a trade secret could have been independently discovered. However, it is also clear that a compilation of public facts can also constitute a trade secret if the compilation itself has remained confidential. *Comprehensive Technologies Intern., Inc. v. Software Artisans, Inc.*, 3 F.3d 730, 736–37 (4th Cir.1993). It would logically follow that this compilation must not be reasonably ascertainable through proper means.

### 2. *Misappropriation*

Once a plaintiff has demonstrated that the information in question was a trade secret, he must then prove that it was misappropriated. The VUTSA details three acts that, under the right circumstances, can constitute misappropriation: the acquisition, disclosure, or use of a trade secret. Va.Code Ann. § 59.1–336.[3] Where a trade secret was acquired or learned through "improper means," any of the three acts will constitute misappropriation. There are a wide variety of methods used to acquire information that will be considered "improper" under the VUTSA. A non-exhaustive list provided by statute includes misrepresentation, breach of a duty or inducement of a breach of a duty to maintain secrecy, and espionage. Va.

Code Ann. § 59.1–336. Espionage is adequately defined as the use of spies to obtain information about the plans or activities of a competing company. The term spy need not carry any cloak and dagger connotations. Simply put, a spy is someone who is employed to convey the confidential information of one company to another.

Where the defendant did not utilize "improper means" to acquire a trade secret, the fact that it possessed a trade secret will not alone constitute misappropriation. Something more is required: disclosure or use. For example, if the trade secret is revealed accidentally or is thrust upon the defendant, unsolicited, the defendant will not be liable for its mere possession of the trade secret. However, should it act on that trade secret, liability will result. The distinction between improper and "innocent" acquisition is important for the present case because there are instances where Business Objects came into possession of a trade secret without having sought it out and apparently did nothing with the information once possessed. Perhaps more importantly, there are also instances where the defendant's employees claimed to have just "bumped into" confidential information or that it just fell into their laps, where it is evident that this information was actively solicited. In such cases, mere acquisition, even without disclosure or use, would be misappropriation.

In order to prevail on a claim of trade secret misappropriation, a plaintiff must produce some evidence that the information in question constitutes a trade secret. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir.1993).

---

**3.** Although the defendant argues there is a split in this district regarding whether mere acquisition can constitute misappropriation under Virginia law, the statute seems clear that it can. Furthermore, it would appear that the Fourth Circuit agrees with this conclusion, albeit in an unpublished opinion. *Systems 4, Inc. v. Landis & Gyr, Inc.*, 8 Fed. Appx. 196, 200, 2001 WL 434586, at *3 (4th Cir.2001).

Moreover, the alleged trade secret must be described "in sufficient detail to establish each element of a trade secret." *Id.* It is not enough to claim generally that trade secrets were stolen. A plaintiff must identify, with particularity, each trade secret it claims was misappropriated. *Id.* This must be done to allow the finder of fact to distinguish that which is legitimately a trade secret from other information that is simply confidential but not a trade secret, or is publicly available information.

▆▆▆▆▆ Finally, it is relevant for the instant case to note that an employer can be liable for trade secret misappropriation committed by an employee acting within the scope of his employment through the doctrine of respondeat superior. *Newport News Indus. v. Dynamic Testing*, 130 F.Supp.2d 745, 754 (E.D.Va.2001). The defendant contends that respondeat superior is inapplicable in this case because its employees signed an employment agreement forbidding them from obtaining or using confidential information from competitors. This argument is unavailing. One can act in the scope of one's employment even if the specific acts performed are explicitly forbidden by the employer, so long as the act was intended to further the employer's interests rather than being wholly motivated by personal interest. Moreover, the employer need not even be aware of its employee's activity. Nor does the court believe that "use" of the trade secret is required in every case where the principle of liability is respondeat superior. The decision in *Newport News Industries* simply mentions use because that was the type of misconduct at issue in that particular case.

## B. Defenses

### 1. *Plaintiff's Failure to Maintain Secrecy*

▆▆▆ As a threshold matter, the defendant has raised several broad defenses to the plaintiff's trade secret claim. The first is that the plaintiff failed to keep the information in question secret during the trial in this matter, and consequently, the material may no longer be considered a trade secret. In response, the plaintiff filed a motion to seal. For two reasons, the court concludes that the disclosure of the evidence during trial did not act to waive the trade secret status of the information.

First, the information was only vaguely publicized. Although discussed and presented on video screens, the contents of the documents were not made public in detail, nor were they ever actually read by the jury, as the matter never made it to a jury. The information presented was hardly enough on which a spectator could gain any understanding as to the secrets in question. Furthermore, the secrecy maintained must simply be reasonable under the circumstances.

▆▆▆ It is clear that nothing of value was revealed during the trial of this matter, particularly considering only laymen were present at the trial other than the parties' representatives. The defendant implies that the jury could have spoken freely regarding the nature of the information; however, the court has had a far greater acquaintance with the information and finds it would be incapable of revealing anything of substance. More importantly, the mere fact that the jurors may have been exposed to the alleged secrets does not make them public. In the context of trade secret misappropriation, a trade secret is public when it is generally known within the relevant industry, not by laymen incapable of understanding or using a particular trade secret.

Second, the mere fact that documents are filed unsealed and are available in public court files does not destroy the secrecy of such documents in the absence of evidence of further publication. *Hoechst*

*Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 418 (4th Cir.1999). In the present case, there has been no publication. Although there have been requests for public copying of certain filings since the trial in this matter concluded, no confidential documents or exhibits have been requested or copied. Under the circumstances, the information in question is as much a secret now as it was before the trial. The instant case is easily distinguishable from *Religious Technology Center v. Lerma*, 908 F.Supp. 1362 (E.D.Va. 1995), where the trade secrets in question were in public court files for twenty-eight months. That fact alone did not render the trade secrets public. Of greater import was the fact that one document had been copied from those files and placed on the Internet. No such publication has occurred in the present case.

### 2. *Plaintiff's Unclean Hands*

██ The defendant's other primary defense is that of "unclean hands." The defendant claims that the plaintiff has engaged in conduct similar to its own. Where Business Objects has been accused of acquiring sensitive documents detailing the plaintiff's software architecture, the defendant alleges that MicroStrategy has done the same.

At the outset, the court notes that MicroStrategy argues that this defense is waived because it was not affirmatively plead. Business Objects claims there is no requirement that an equitable defense be raised in an answer to a complaint. The court believes the matter is more complicated than the manner in which the parties have characterized this issue. While Business Objects cites hornbook law stating that, in Virginia, "unclean hands" need not be affirmatively plead, there is overwhelming case law, both state and federal, which describes it as an "affirmative defense." Furthermore, the mere fact that this defense has been omitted from the list pro-

vided in Federal Rule of Civil Procedure 8 does not mean it is not an affirmative defense. That list is clearly a non-exhaustive list of examples. Finally, the fact that Virginia law may not consider it an affirmative defense does not necessarily prevent this court from considering it one. However, the court need not decide this issue as it does not believe the defense is applicable in this case.

██ As the plaintiff points out, the allegation of unclean hands does not pertain directly to the events at issue in this case. While the defendant believes there is a sufficient nexus between the plaintiff's alleged wrongdoing in obtaining confidential information from Business Objects, they do not provide any helpful case law. The proper rule is not simply one of hypocrisy or general bad character. It is not enough to claim that the opposing party engaged in similar conduct at some point in the past. Instead, the inequitable conduct must concern the actual events at issue. As the plaintiff points out, the allegation of inequitable conduct "must relate *directly* to the matter in litigation. It is not sufficient that the wrongdoing was remotely or indirectly connected with the subject of the suit." *Richards v. Musselman*, 221 Va. 181, 267 S.E.2d 164, 167 (1980) (quotation omitted). If the plaintiff had used Business Objects' trade secrets to create one of the documents in question, then the court might be convinced that the unclean hands defense was applicable. The court does not, however, believe the defendant has provided sufficient evidence to support such a conclusion in this matter.

### 3. *Plaintiff's Failure to Supplement Interrogatories*

The defendant's final contention is that the plaintiff cannot contend specific information is a misappropriated trade secret if that information was never listed in any of

its interrogatory answers regarding trade secrets. The defendant once more invokes Federal Rule of Civil Procedure 26(e)(2), which concerns a party's obligation to supplement an interrogatory answer, and Rule 37(c)(1), which provides the penalty for the failure to supplement. Rule 37(c)(1) states, in pertinent part, that information not disclosed in an interrogatory answer may not be used as evidence at a trial. The Rule does provide alternative forms of sanctioning a party as well. At trial, the court accepted the defendant's argument regarding this rule's application to certain evidence of damages. For two reasons, the court does not do so now.

■■■ First, despite the defendant's contention that the rule is applicable even after a trial has concluded, the court is unconvinced. In the court's view, it was the defendant's obligation to raise any objections it might have had to evidence when it was being introduced. The court notes that the parties raised a host of objections to almost each and every exhibit prior to trial. Those objections were, for the most part, reserved by Magistrate Judge Miller for a ruling by the court at trial. To the court's knowledge, no objections were raised prior to or during trial relating to the contention that a document was inadmissible due to a failure to supplement interrogatory responses. As a result, such objections have been waived.

Second, the final pretrial order indicates that the primary objection relating to the admissibility of these documents was that they were not admissible during the tortious interference portion of the case. The contention was that they were admissible only for the trade secrets portion of the trial. For obvious, strategic reasons, at that time, the defendant did not want such documents presented to a jury, which served as the finder of fact in the tortious interference portion of the trial. The defendant cannot now argue that these docu-

ments are completely inadmissible because it was not on notice that these would be introduced as part of the trade secrets claim when it argued that the admissibility of these documents should be confined to the trade secrets portion of the trial.

## C. The Alleged Trade Secrets

In general, MicroStrategy has demonstrated that it took reasonable steps to preserve the secrecy of its information. As noted, the company had in place physical security preventing access to confidential information as well as software-related security measures. The company also ensured that its employees were contractually bound to keep such information confidential. Such contract terms were made known to employees in a number of ways, including emphasizing the need to maintain secrecy in the employee handbook in addition to the contract terms themselves.

The plaintiff has demonstrated, very generally, that its confidential information has economic value. The plaintiff points specifically to the fact that it spends millions of dollars a year on product research and development, and training of employees. The plaintiff has also offered how certain specific pieces of information had economic value. *See* Pl's Proposed Conclusions Law ¶ 14, at 48. The plaintiff has also proven that some of the information in evidence was used or disclosed by the defendant. *See id.* ¶ 15, at 48–49, ¶ 35, at 54. Finally, the plaintiff has offered evidence suggesting that the defendant may have used improper means to obtain some of the information at issue. *See id.* Part A, at 51.

While the elements of a misappropriation of trade secrets claim are present with regard to a number of pieces of information, the court must assess each alleged trade secret according to the requisite elements. In other words, it is not enough to

say the defendant used the information in exhibit X, that the information in exhibit Y was secret, and that the information in exhibit Z had economic value. Each item must be assessed to determine if it is a trade secret and if it was misappropriated.

### 1. *Internal MicroStrategy Email*

█ The court first addresses the email sent to all MicroStrategy employees from CEO Michael Saylor concerning the company's financial problems and future plans for surviving such difficulties. Ex. P1. The court concludes this email does not constitute a trade secret. First, while of interest to anyone in the business intelligence industry, it is unclear what potential economic value this email would have had to anyone. In fact, no specific evidence was presented regarding the economic value of this email to competitors. The court is unconvinced that the general comments from Michael Saylor regarding this email suffice to demonstrate economic value. See Tr. Trans. at 897 (Saylor Test.) (noting vaguely that the email could be used against MicroStrategy in a "myriad different ways").

Second, the vast majority of the information contained in the email was public or was to be made public in the press release that accompanied it. The information consisted of very general comments about the fact that the company was in trouble, a well-known problem, why it was in trouble, also well-known, and the solution to that problem—downsizing and narrowing the company's focus—also unsurprising. While this email was undoubtedly intended to be confidential, and its disclosure might have constituted a breach of contract by the MicroStrategy employee who revealed it, it was not a misappropriated trade secret.

### 2. *AlphaBlox Competitive Document*

█ This document, exhibit P7, was forwarded from Tom Papp when he was still a MicroStrategy employee to Phil Maloney at Business Objects. Assuming for argument's sake that the document was a trade secret, there is insufficient evidence to support the conclusion that this information was misappropriated. First, the court believes the plaintiff must show use or disclosure by the defendant to prevail because there is no evidence that the defendant used improper means to obtain the information. This instance seems to be a case where information really did just fall into the lap of a Business Objects employee, unlike much of the information circulated throughout the company that employees claimed had just "fallen into [their] hands", but in reality had been actively sought. See ex. P695N. This information was unsolicited, and there is no evidence from which the court can infer that Papp was expected to supply information to obtain a job with the defendant or was asked to do so. Papp had been offered jobs previously by Phil Maloney and the two had been friendly for many years. He did not need to please his prospective employer in order to get a job. The court agrees with Business Objects CEO Bernard Liautaud's contention that it is not inappropriate to simply receive information in the absence of evidence that it was used, disclosed, or actively solicited. See Liautaud Dep. at 150–51.

Because receipt of the information was not improper, the court addresses whether the information was ever used or disclosed. There is no evidence to support such a conclusion. It would appear that Maloney may have read part or all of the email and dismissed it as unimportant. The email string and his live testimony indicate that he did not think much of AlphaBlox and that the information was of little use to him. No further evidence exists on this issue; therefore, the court concludes the information was not used or disclosed, and

plaintiff has not proven the defendant misappropriated it.

### 3. *Business Objects Competitive Recipe*

■ As noted, Corey Sommers obtained this document, plaintiff's exhibit 5, from an unknown source. It described the means by which the MicroStrategy sales force could compete with Business Objects in obtaining business. Based on its findings of fact detailed above, the court concludes that reasonable efforts were made to maintain the secrecy of this document. It was not circulated outside of MicroStrategy with one exception and within MicroStrategy was only provided to the field sales staff. The one exception was in providing the document to the Gartner Group. The court finds the testimony of Sanju Bansall credible that this disclosure was made in confidence. It is not necessary that there have been a written agreement memorializing the confidentiality of the disclosure. Nor did this single disclosure, in confidence, render the document public.

It is also clear that this document had enormous economic value, both to MicroStrategy and to Business Objects, as demonstrated by the testimony of Michael Saylor, discussed above. The court does not accept the defendant's contention that because the document concerned Business Objects it was of no economic value to Business Objects. The document's value was, in part, premised on the fact that it detailed how MicroStrategy would counter the various aspects of Business Objects' product or exploit various weaknesses or deal with "traps" regarding its own product. The analogy to a playbook is quite apt in this instance, and Business Objects came into possession of that playbook. From the nature of the document and from Sommers' comments in circulating the document, Business Objects was well aware of the importance of this document. Even though it was ten months old at the

time, there is no evidence that the information had become valueless when it was disclosed.

Finally, this document was not obtained from a public source or from a MicroStrategy customer, given the testimony from Bansal regarding the limited distribution of this document. Nor did Business Objects receive the document from the Gartner Group as it admits that the version it possessed was different than the version supplied to the Gartner Group. This document could only have been obtained from an employee of MicroStrategy, in breach of his employment agreement. Given the overwhelming evidence that this type of information was actively solicited from MicroStrategy employees by ex-employees of the company who moved on to Business Objects, like Sommers, it is clear that the document was obtained improperly. In light of these conclusions and the court's findings of fact on this particular document, the court concludes that the Competitive Recipe was a trade secret and that Business Objects misappropriated this trade secret.

### 4. *The "New Way of Selling"*

■ When Tom Papp left MicroStrategy, he gave a presentation regarding a method of selling that generated great interest within Business Objects, all the way up to Bernard Liautaud. Sales techniques can constitute trade secrets even if such techniques are generally known, providing the combination of such techniques is sufficiently novel and secret. In the present instance, it appears that most of the components of the way of selling that Papp described to Business Objects employees was commonly known, including solution selling and paid proof of concepts.

Efforts were made by testifying executives at Business Objects to (1) downplay the importance of the method and (2) con-

tend that it was really Tom Papp's way of selling. Business Object's own email evidence could not be clearer that this was not a "system" unique to Papp. Furthermore, the court finds Michael Saylor's testimony credible on the issue. Saylor testified that the sales process described constituted a method resulting from the company's trial and error over the years.

However, it is clear that this method of selling was readily ascertainable by any interested party. A competitor could simply ask a MicroStrategy prospect what the plaintiff had done in making its sales pitch. Little effort would have been required to discover that the plaintiff may have paid for its proof of concepts, had packaged long-term service into the deal (solution selling), and that Michael Saylor had contributed to selling the company's product. In essence, this was a large part of the selling method employed and it was made public each time it was utilized. No evidence was provided that a prospect was unable to discuss the type of sales pitch employed, even if they may have been prevented from discussing the content of that sales pitch.

Furthermore, a number of these techniques were already used by Business Objects. For example, one important aspect of the sales method was using high-level executives to court the prospective customer. While a fixture at MicroStrategy, such a method had been employed, albeit rarely, at Business Objects. *See* Ex. P6 (Liautaud's comments). It would be difficult for the court to conclude that MicroStrategy had a trade secret in a combination of techniques that the defendant used in a less systematized manner. The court could not enforce an injunction every time the defendant's CEO met with a prospective customer. Additionally, despite attempting to make it sound like there was a uniform set of sales rules that MicroStrategy employed every time it sold to a

prospect, it appears that the methods were employed in an ad hoc manner. For example, paid proof of concepts were not used every time MicroStrategy attempted to obtain business, and may not have been used often at all. Papp Dep. I at 65.

The difficulty that the court would have enforcing an injunction prohibiting the use of such a sales method highlights why it is not a trade secret. The court could not enjoin Business Objects every time it (1) sold services in addition to software, a large component of any software company's revenue; (2) its CEO met with a prospect and pitched the company's "vision"; and (3) paid for the proof of concept. Such techniques are far too generic for the court to say that their use in combination constituted a trade secret. While MicroStrategy may have employed a far more detailed plan in selling to customers, the evidence did not demonstrate that the more proprietary and confidential details of such a strategy were discussed or even existed.

### 5. *Volume Discount Schedule*

■ This document, really a table contained in email exhibit P695–A, was a schedule of discounts that MicroStrategy would give to its customers at certain amount thresholds. Corey Sommers obtained this information from an unknown source. Once more, the tenor of the emails addressing this schedule suggests that he did not obtain the information from a public source or that the information was publicly available. References to a "little bird" providing information does not suggest legitimate sources. Instead, it suggests that the information was confidential and that it was improperly solicited and obtained, either through "espionage" as used in the VUTSA, or by inducing the breach of an employment agreement. For example, in the next exhibit, P695–B, Lee-

na Shah provides pricing information in response to questions from Corey Sommers wherein she indicates that this information was solicited from an ex-MicroStrategy employee. That ex-employee breached his employment agreement in providing such information and it is clear that actively soliciting such information induced the breach. It takes no great stretch of the imagination to conclude that this ex-employee would be hoping to get a new job in the same field, perhaps with Business Objects, and that it would behoove him to be responsive to inquiries from that company's employees.

According to Sanju Bansal, the volume discount schedule was never made publicly available in any trade reports, like the OLAP report. Tr. Trans. at 648 (Bansal Test.). Michael Saylor characterized the information as "hyper-confidential." *Id.* at 917 (Saylor Test.). While it was admitted that some pricing information concerning the business intelligence industry appeared in the OLAP report, there is no evidence that MicroStrategy's volume discount price schedule was ever reproduced in such reports. A Business Objects price schedule of some kind apparently was disclosed in such a report; however, that fact alone does not mean MicroStrategy's schedule was not a trade secret. Testimony made clear that a volume discount schedule was qualitatively different from a standard price list and that this schedule was not even made available to customers. *Id.* at 646 (Bansal Test.). Instead, the sales force used the schedule to develop price quotes for customers. *Id.*

Obviously, this information would be of economic value to a competitor. As Bansal testified, a competitor possessing knowledge of such pricing could undercut MicroStrategy or price differently to influence a prospect's decision of which product to purchase. Furthermore, it is clear that this information could not be easily gained through legitimate means. The prices given to a particular customer are a unique blend of that customer's financial strength, competitive forces, and MicroStrategy's willingness to set a particular price to obtain the deal. *Id.* at 909–17 (Saylor Test.).

Finally, this document was actually used by the defendant when Leena Shah incorporated the schedule into her training materials. As such, it does not matter whether improper means were used to obtain the information, although the email and testimony demonstrate that this schedule was solicited improperly from an unknown MicroStrategy employee or taken by an ex-employee when he moved to Business Objects. In light of the evidence, the court concludes that the discount schedule was a trade secret that was misappropriated by the defendant.

### 6. *Target Accounts List*

 Plaintiff's exhibit 17 was a list of accounts targeted jointly by MicroStrategy and one of its partners, ThinkFast. It also included current MicroStrategy customers. The defendant argues that customer identities are generally known and that MicroStrategy made them public. However, this list included targeted accounts in addition to current MicroStrategy customers, a class of company not generally known. The credible testimony from Sanju Bansal was that target lists involved an expenditure of resources to create.

This information was considered confidential. *Id.* at 641 (Bansal Test.). Tom Papp agreed this was not the sort of thing that properly would be in the possession of a competitor. Bansal credibly testified that this information would be of value to a competitor that could determine where to apply its resources and who to target, as did Saylor. *Id.* at 644–45 (Bansal Test.); 908–09 (Saylor Test.). While the court concludes that this document constituted a

trade secret, the court cannot conclude that it was misappropriated.

The most difficult aspect of this document is its source. Ennis and Papp both received the document while at MicroStrategy. Given the amount of information that Ennis took with him from the plaintiff, it is reasonable to assume that this document originated with Ennis. Only one document has been attributed to Papp, the AlphaBlox document, a document he sent to Phil Maloney, rather than a document he took with him when he switched jobs. As a result, there is no reason to believe the Target Accounts List is not attributable solely to Ennis.

■ There is no evidence that it was circulated within Business Objects or used by the defendant, like all of the documents Ennis took with him. Consequently, there must be evidence that it was improperly acquired. The court does not believe that liability attaches to Business Objects via the doctrine of respondeat superior simply because John Ennis took confidential documents from MicroStrategy and placed them on his Business Objects laptop. Any breach of his duty to MicroStrategy would appear to have occurred in the absence of any knowledge of Business Objects. Furthermore, it is unclear that one could state that Ennis was a Business Objects employee when he committed any alleged breach of his employment agreement with MicroStrategy, which would have occurred, if at all, when he sent these documents to his personal email account. Finally, it also appears that this situation is similar to any where an ex-employee possesses knowledge of his former employer's trade secrets. That employee has not committed any misappropriation simply because he knows the trade secrets; he must do something with them.

Accordingly, the court does not believe that any of the documents John Ennis copied from MicroStrategy were misappropriated in the absence of any evidence that they were disclosed to other employees at Business Objects or that Ennis used them in working at Business Objects. The court wishes to emphasize, however, that Ennis did violate both his MicroStrategy and Business Objects employment agreements. It would also seem that he did possess trade secrets and was properly terminated by Business Objects. However, his wrongdoing is not attributable to the defendant.

### 7. *Features of MicroStrategy 7i*

■ As the court has noted in its findings of fact, a document titled "What's New in MicroStrategy 7.2" was disclosed widely throughout Business Objects. This document was in Business Objects' hands two months before the general release of the software. Tr. Trans. at 215 (Bedell Test.).

The defendant makes a number of arguments regarding this document: that it was not labeled confidential, that it appears to be a marketing document for customers, and that there is no evidence it was not generally known or readily ascertainable through proper means. The version produced to the court is not labeled confidential; however, it is appropriate to infer that it was stripped of any MicroStrategy-related markings. Leena Shah mentioned in one email that she had to get the document in "non-MicroStrategy" form before circulating. Furthermore, it does not appear to be intended for public consumption. Several of the comments regarding features of the product indicate as much. While the defendant cites press releases detailing features of MicroStrategy products that predate this document, it appears that these press releases concerned MicroStrategy 7.1, an earlier version of the software.

The court can easily conclude this document was misappropriated. It was solicited by Leena Shah from another ex-MicroStrategy employee in violation of that employee's agreement with MicroStrategy. The court cannot, however, conclude this document contained trade secrets. No testimony was elicited regarding the inherent economic value of this particular document, what this document actually was, or any efforts to maintain the secrecy of this document. There is no reason for the court to believe that this document was kept confidential simply on the basis of general testimony regarding MicroStrategy's attitude towards the new features of its products. This is particularly true when those statements are contradicted by exhibits wherein MicroStrategy did publicize the new features of earlier versions of the software. Additionally, Shah testified that the information was already public, and the court finds it easy to believe that high-level details of upcoming software would become generally known despite any company's efforts to maintain their secrecy. Furthermore, while more technical information regarding these features might be of economic value to a competitor, the mere knowledge that software already being beta tested and two months from release (and already long overdue for release) possesses a particular feature does not seem to provide an economic advantage to a competitor.

### 8. *Ithena Competitive Document*

This document, plaintiff's exhibit 40, was allegedly taken by Shad Syfert to a job interview with Phil Maloney, who he permitted to view the document. The document has not been produced in discovery. The defendant claims it was a confidential Business Objects document that MicroStrategy had in its possession—clearly known by Business Objects and cannot be a secret. This characterization is incorrect. The document was apparently prepared by MicroStrategy using some information provided by Ithena employees, probably at trade shows. Such information would be considered public. The bigger issue is whether there was any additional analysis in the document that could be considered a trade secret. Insufficient evidence has been provided to lead the court to reach any such conclusion. The court has no knowledge of the contents of the document; therefore, it would be impossible to assess whether there was a portion not based on public information and not easily ascertainable through public means. Consequently, the court cannot reach the conclusion that this was a misappropriated trade secret.

### 9. *Training Manuals*

■ The plaintiff alleges that training manuals and an employee handbook provided to Shad Syfert were trade secrets. *See* exs. P22, P24–28. There is no solid evidence to indicate that the information would be of economic value to anyone. The court assumes, however, for purposes of argument that these manuals constituted trade secrets. Apparently, the manuals were provided during Syfert's training when he was hired at MicroStrategy. He testified that the company did not require that he return the manuals. The manuals sat in his basement until being produced for purposes of this litigation. Tr. Trans. at 1140–41 (Syfert Test.). In this context, it is clear that the defendant came into constructive possession of the information, if at all, through proper means. Syfert's possession was not demonstrated to be in violation of his confidentiality agreement with MicroStrategy. Under such conditions, the defendant must have used or disclosed the information.

No evidence or inference exists that Syfert provided this information to anyone within Business Objects or anyone else.

No evidence exists that the manuals were used in any way. The only testimony, which the court finds credible, is that the information was in Syfert's sole possession at his home and was produced for the first time as a result of the instant litigation. As such, the plaintiff has not met its burden regarding any training manuals.

### 10. *Competitive Presentations Zip*

These documents were mentioned in an email, plaintiff's exhibit 2, circulated within Business Objects. Exhibit Two consists of an internal email referring to the fact that one employee came into possession of various presentations prepared by a number of companies, including MicroStrategy. There is absolutely no detail provided regarding what the MicroStrategy presentation concerns; therefore, no way exists to determine if the information was confidential or could rightly be considered a trade secret. No attempt was made to establish any of the elements of trade secret status or of misappropriation. Consequently, the plaintiff has not met its burden. This email is, however, an additional example of the manner in which the defendant came into possession of large amounts of information from other companies via "little birds" or other undisclosed sources.

### 11. *Anti–BO FUD Doc*

 As noted in the court's findings of fact, this document, exhibit P695I, was obtained by Corey Sommers. There is no evidence regarding this document aside from that exhibit and Sommers' own testimony. On the face of that exhibit, nothing indicates that it was improperly obtained or that it was confidential. The email to which the document was attached stated this document "had been going around" and was a simplified version of whatever document had been circulating. Ex. P695I. Although it was marked confidential, this fact alone is not dispositive and does not raise a document to the status of

trade secret in the absence of other evidence. The email suggests that this information had been circulating in the business intelligence industry. As a result, the court concludes that the document was already public information when it was obtained by Sommers and there was no way to know that it might have represented a trade secret that had been improperly publicized. Additionally, it does not appear that there was any testimony that would permit the court to conclude that the information contained in this document satisfied the elements of a trade secret.

### 12. *TCO White Paper*

Corey Sommers drafted this white paper, and he circulated it to other ex-MicroStrategy employees for feedback. *See* ex. P84. The court has not seen the actual white paper nor heard any testimony regarding its specific contents. On its surface, it would appear to represent a permissible use of Sommers' personal knowledge of MicroStrategy's products. In other words, not a trade secret. There is simply nothing to suggest that the information contained within was a trade secret.

 There are other similar instances where former employees gave information regarding MicroStrategy products based on their own personal knowledge to Business Objects. Such occurrences were not addressed in any significant detail at trial as being a misappropriation of trade secrets and the court must simply conclude that they were permissible uses of personal knowledge. For example, Sommers also taught various Business Objects personnel about the differences between the plaintiff's and defendant's respective products' architecture. Sommers Dep. at 183–95. He also provided personal insight into how the Business Objects sales staff should position the defendant's products against

MicroStrategy. For similar reasons, this information was not a MicroStrategy trade secret.

### 13. *MicroStrategy Recommended Sales Strategy*

This document, plaintiff's exhibit 555, was drafted by Sommers. There is nothing on the face of this document from which the court could conclude that Sommers utilized valuable confidential information to develop it. It is a high level assessment of MicroStrategy's software and its selling points. In fact, apart from Sommers' own testimony regarding the document, the court recalls no evidence concerning this document. The mere fact that the information was learned while Sommers was employed at MicroStrategy does not demonstrate the information is subject to trade secret status. Consequently, MicroStrategy has not met its burden of demonstrating this document consisted of misappropriated trade secrets.

### 14. *FutureNext/Grainger Opportunity Brief*

██ John Ennis forwarded an opportunity brief to Phil Maloney at Business Objects prior to departing MicroStrategy. Ex. P152. The brief was from FutureNext and assessed a prospective client, Grainger. There is not any evidence to support a misappropriation of trade secrets claim. The primary reason is that the document was not MicroStrategy's. The plaintiff has offered no case law wherein a document not prepared by a plaintiff can be considered that party's trade secret based on the factual context present in the current instance. There is no indication of whether MicroStrategy considered this document confidential, whether its creator, FutureNext, considered it confidential, or what FutureNext's relationship was to MicroStrategy.

Certainly, the email exhibit accompanying this brief is disturbing as it indicates Ennis did not pursue a MicroStrategy business opportunity while employed by the company because he was simply waiting to get out of the company. *See* Ex. P152. The business opportunity was not his to pursue or delay pursuit until it was convenient to him. However, this potential breach of his employment contract or breach of a duty of loyalty to MicroStrategy is not at issue in this case.

### 15. *Documents John Ennis Emailed to Tom Papp*

Exhibits P81–83 consist of technical documents relating to a MicroStrategy product, Narrowcast Server, that John Ennis emailed to Tom Papp after both had decided to leave MicroStrategy, but prior to their departure. There is no content in the email suggesting the reason why Ennis sent them to Papp. Furthermore, no testimony was offered as to whether this information met trade secret status. On their face, they are stamped confidential. This fact alone cannot support a finding that a document is a trade secret; however, they certainly appear to be the kind of technical documents that would constitute trade secrets. Again, it would seem that these documents were retained by Ennis and made their way onto his Business Objects computer. There is no evidence they were used or disclosed within that company. In light of this evidence, the court cannot conclude that the plaintiff has satisfied its burden.

### 16. *MicroStrategy Technical Architecture White Paper*

██ This document appears in two exhibits attached to two email messages, plaintiff's exhibits 15 and 16. The document is a lengthy technical overview of the MicroStrategy architecture. All the evidence before the court indicates that this document was a trade secret. It is not the

type of "high-level" analysis of technical architecture that is not considered confidential. Instead, it is detailed and comprehensive, and testimony indicates that detailed technical reports like this are kept confidential by MicroStrategy.

From the email attachment describing the document it is clear that MicroStrategy considered the document to be confidential. It was to be distributed to customers or prospects only under a non-disclosure agreement (NDA). *See* ex. P15. In an email to a customer, John Ennis reiterates the fact that he is sending this document only because the customer had a non-disclosure agreement with MicroStrategy. Ex. P16. Each page of the document provides that it is confidential and is to be supplied pursuant to an NDA alone. Its economic value is obvious, and it would not be easy to independently create such a document based on the operation of the software itself.

Once more, the court concludes that this document is attributable solely to John Ennis. Again, there is no evidence it was disclosed or used within Business Objects. In light of the court's earlier reasoning regarding Ennis' clearly inappropriate behavior, the court does not conclude that this document was misappropriated by Business Objects.

17. *Comments Provided by Recruits Regarding MicroStrategy Software*

■ There are a number of instances where ex-MicroStrategy employees provided information based on their own experience and knowledge regarding how MicroStrategy's software functioned or how the company sold its software. Such knowledge, based on the functioning of publicly available software is not proprie-

tary, confidential information. No evidence was presented to suggest that this information was something that would not be known by any daily user of the software. Consequently, such information does not rise to the level of trade secret status. There are a few more examples where individuals, like Alex Brown, gave very general information regarding certain features of the unreleased MicroStrategy 7.2. There is insufficient evidence, however, to conclude that the information constituted a trade secret.

18. *CD Keys*

The evidence before the court is that members of Business Objects, primarily Leena Shah, actively solicited and obtained CD keys to open various MicroStrategy applications. The court excluded evidence relating to the CD keys during the tortious interference portion of the trial because the defendant had no prior notice that this would be an issue at trial. For that reason alone, the court sees no reason to consider the same evidence during the trade secrets portion of the litigation. The basis for excluding it now is the same: that it was not mentioned in the plaintiff's interrogatory responses. Unlike the defendant's contentions that much of the evidence discussed should be excluded based on Federal Rule of Civil Procedure 37, this particular issue was raised during the trial and has not been waived.[4]

**D. Conclusion**

Clearly, many of the plaintiff's ex-employees engaged in extensive conduct that could be considered unethical, improper, and in breach of their employment agreements. These employees solicited or

---

4. The court also voices its skepticism that a CD Key can constitute a trade secret. A trade secret is information and a CD Key, a series of random numbers, is not information. Instead, it is a lock—a barrier—to the access of information that might properly be considered a trade secret.

brought with them to Business Objects a number of confidential documents belonging to MicroStrategy, several of which the court concludes constituted trades secrets, and many more of which might very well have been trade secrets regardless of the insufficient evidence presented at trial to support such an inference. In only two instances, however, can the court conclude that sufficient evidence exists to prove that misappropriation of such trade secrets occurred.

## E. Remedies

### 1. *Attorneys Fees*

■ Both the plaintiff and defendant have asked the court to award attorneys fees. The VUTSA authorizes the court to award attorneys fees if a defendant's misappropriation was wilful and malicious or if a plaintiff's claim was made in bad faith. Va.Code. Ann. 59.1–338.1. Because the plaintiff has prevailed, in part, in this matter, the court will not award fees to the defendant. With regard to the plaintiff's request, while the court has little trouble finding that the acts taken were wilful, malice requires a finding that the action was taken with "ill will, malevolence, grudge, spite, wicked intention or a conscious disregard of the rights of another." *Peacock Buick v. Durkin,* 221 Va. 1133, 1137, 277 S.E.2d 225 (1981); *see also American Sales Corp. v. Adventure Travel, Inc.,* 862 F.Supp. 1476, 1481 (E.D.Va. 1994).[5] Because punitive damages are heavily disfavored in Virginia, the court believes awarding attorneys fees is similarly disfavored, given the fact that both require a showing of malice.

■ In the instant case, it is true that the email exhibits in evidence contain statements regarding the defendant's desire to "slam the [plaintiff's] coffin shut", it would seem that such comments were merely facetious. Ex. P180; *see also* ex. P13. In the absence of true evidence of malicious intent, the court will not read too much into such email.[6] Aside from these comments there is simply nothing before the court that would lead it to conclude that there was any sort of malicious intent at work. For example, no evidence exists that the ex-MicroStrategy employees disclosed information within Business Objects as a means of effecting some sort of revenge on the plaintiff. In other words, the acts committed are not of a degree requiring an award of attorneys fees.

### 2. *Injunctive Relief*

■ The court is authorized to enjoin actual or threatened misappropriation. Va.Code Ann. 59.1–337. In the present case, the court has found that certain trade secrets have been misappropriated. Accordingly, the court will exercise its equitable powers and grant the plaintiff's request for an injunction. The plaintiff has submitted a proposed injunction; however, the court agrees with Business Objects that its scope is too broad. An appropri-

---

**5.** Although the plaintiff stated it would file a statement indicating the work done and the fees requested, it never did so, as required by Rule 54 of the Federal Rules of Civil Procedure. Rule 54 does permit the parties fourteen days from the date of entry of judgment in which to file a motion for attorneys fees. The court need not address whether either party would be permitted to amend their requests to add an accounting of the amount sought because both requests fail on the merits.

**6.** There are also email comments in which the plaintiff is referred to as "the dark side." The court does not believe such references to the Star Wars series of films implies that the defendant's employees were of the sincere opinion that MicroStrategy was inherently evil and must be destroyed. Furthermore, the plaintiff was guilty of similar humor, nicknaming its test version of MicroStrategy 7.2 "BOID" or "Business Objects is Dead."

ate injunction in a trade secrets case limits its scope to prohibiting action involving the specific documents identified as trade secrets, whereas the proposed injunction effectively enjoins any future misappropriation of trade secrets. The court cannot conduct show cause hearings over the coming years every time the plaintiff believes Business Objects has acquired a document it considers to be a trade secret. Consequently, the court limits the injunction to the specific documents identified as trade secrets.

The court is well-aware that the documents described may no longer constitute trade secrets. The VUTSA permits a defendant to petition a court to dissolve an injunction when the information has lost its trade secret status. Va.Code Ann. § 59.1–337(A). However, the statute also permits the court to extend the injunction for a reasonable period despite this fact. *Id.* Consequently, the court will enjoin Business Objects for a reasonable minimum period, at which time it may petition the court to dissolve the injunction, should it desire to do so.

Business Objects, S.A. and Business Objects Americas, Inc., will not be permitted to possess, use, or disclose the misappropriated trade secrets described above, the Competitive Recipe, part of plaintiff's exhibit 5, and the Volume Discount Schedule, incorporated into plaintiff's exhibit 695–A. Business Objects, S.A., and Business Objects Americas, Incorporated shall return any paper copies of the listed documents to the plaintiff, and shall delete any electronic copy of the documents from their computers, servers, or other similar devices. An officer of Business Objects, S.A. and Business Objects Americas, Inc., shall file with this court and serve upon MicroStrategy a sworn certificate of compliance within thirty (30) days of this order.

The defendant may petition the court to dissolve the injunction on the basis that the information in question no longer constitutes a trade secret no earlier than six months from the date of this order. This injunction shall be binding upon the parties to this action, their officers, agents, servants, employees, and upon those persons in active concert or participation with them who receive actual notice of the order. This injunction is not binding on the defendant's outside counsel in this matter, who may use the documents in question for the sole purpose of litigating the instant action.

### F. Pending Motions

There are a number of pending motions in this matter that require resolution as well. The plaintiff filed a motion to seal the trial exhibits once it learned of the defendant's argument that any trade secrets were made public as a result of the trial and the failure to seal the documents during the trial. The court is of the opinion that this motion was filed simply as a means of countering any argument that it waived the right to assert that its confidential documents retained any trade secret status following their introduction at trial. The court has resolved this issue in favor of the plaintiff and feels that sealing the exhibit is unnecessary at this time given the fact that they revert to the plaintiff's possession in thirty days according to the local rules of this court. *See* Local Rule 79(C).

The plaintiff also filed a motion to reopen discovery premised on its claim that a Business Objects employee misrepresented his identity in order to attend a MicroStrategy conference, portions of which included the disclosure of confidential information. In the court's view, this event is not relevant to the present issue of whether Business Objects misappropriated the information discussed above. As such, the plaintiff's motion is denied.

### III. CONCLUSION

For the reasons stated on the record at the trial in this matter, Business Objects, S.A., and Business Objects Americas, Incorporated's motion for judgment as a matter of law on the plaintiff's tortious interference claim is **GRANTED**. With regard to the plaintiff's misappropriation of trade secrets claim, for the reasons discussed in this Opinion and Order, the court **FINDS** for the plaintiff, and will enter an appropriate injunction. The plaintiff's request for attorneys fees is **DENIED**, as is the defendant's similar request. The plaintiff's motion to seal certain trial exhibits is **DENIED**. The plaintiff's motion for additional discovery is **DENIED**. All other pending motions relating to either of these claims are MOOT.

Business Objects, S.A., and Business Objects Americas, Incorporated are hereby **ENJOINED** from possessing, disclosing, or using the Business Objects Competitive Recipe, contained in plaintiff's exhibit 5, and the volume discount schedule incorporated into plaintiff's exhibit 695–A. Business Objects, S.A., and Business Objects Americas, Incorporated shall comply with this injunction in the manner provided above. This injunction shall remain in full force and effect until further order of this court.

The Clerk is **REQUESTED** to send a copy of this Order to counsel of record.

It is so **ORDERED**.